## W. A. TITUS et al. v. PIGGLY WIGGLY CORPORATION et al.

Western Section.  May 26, 1925.

1. **Corporations. Revaluations.** Capital assets may be revalued by the officers of a corporation from time to time as the actual value may increase or decrease.

   Assets of a corporation are entitled to be revalued at the actual value of the same, and in arriving at the actual or real value of capital assets as of a given date, the corporation would not be governed solely and entirely by the original or initial cost.

2. **Corporations. Revaluations.** The actual or real value of capital assets should not be left to mere speculation, nor to an arbitrary valuation intended to cover deficits or to restore impaired capital.

   Before there can be a revaluation or a writing up of assets on the books of a corporation of a tangible or intangible character, there must be a

tangible basis upon which the valuation is fixed that is of it-elf evidential of the actual value of such assets.

3. Corporation. Assets. Royalty or agency contracts are inseparably connected with patents, trade names, etc. for purposes of valuation.

Where a corporation is revaluing its assets held that the royalty or agency contracts for the use of its patents and trade name cannot be valued as a separate asset apart from its patents, trade names, good will, etc.

4. Corporations. Revaluation. Evidence, held to warrant an increase of $4,000,000 in the value of the assets of the corporation.

Where corporation's assets consisted mostly of royalties from stores and the number of stores had increased from 150 to 1700 and the annual statement of profits and losses covering each of the several years showed a large increase in profit, held court would not say revaluation figures were not justified and warranted.

5. Corporation. Payment of dividends. Dividends cannot be paid out of surplus created by revaluation of assets unless the surplus has actually been realized.

Dividends may be paid out of realized earnings or profits only. Dividends cannot be paid out of a surplus created by the revaluation of assets unless the profit has actually been taken and realized.

6. Evidence. Parol evidence not admissible to change written agreement.

Where president of corporation at the time of making a contract for the extension of time of payment of notes stated that he was a "debt-payer and that he would pay these notes as early as possible" held to mean he would pay notes as soon as possible and did not mean the corporation contracted to pay the notes before maturity.

7. Corporations. Payment of dividends. Corporations cannot pay dividends on preferred or common stock when capital of corporation impaired.

Corporation cannot stipulate to pay dividends on preferred stock under Delaware laws of incorporation if at the time the capital of corporation is impaired.

8. Corporation. Payment of dividends. Held capital was not impaired and corporation could pay dividends on preferred stock.

Evidence held to show that revaluation of assets left corporation with no actual impairment of capital stock.

9. Corporation. Payment of dividends. Dividends must be paid on preferred stock if corporation shows earnings and profits and it causes no impairment in capital stock.

If the corporation shows earnings and profits out of which dividends on the preferred stock may be lawfully paid, the holders of preferred stock have the contractual right to demand and receive dividends as stipulated in the certificate of stock provided there is no impairment in the capital stock, and other legal obligations of the corporation are met.

10. Corporation. Payment of Dividends. Payment of dividends on common stock lies within discretion of directors.

The matter of paying dividends by a corporation, especially on the common stock, is within the sound discretion of the Directors, and this discretion is not subject to the direction of the courts, except in the case of a clear abuse, and so long as the Directors of the corporation are acting within the lawful limits prescribed by the charter and the laws of incorporation under which the corporation is acting the courts cannot interfere.

Appeal from Chancery Court, Shelby County; F. H. Heiskell, Chancellor.

Reversed and remanded with instructions.

Bass, Berry & Simms, of Nashville, Holmes & Canale, of Memphis and W. E. Norvell, Jr., of Nashville, for appellant.

Fitzhugh, Dixon & Osoinach, and Taylor & Goodman, and Chas. N. Burch, all of Memphis, for appellee.

SENTER, J. The original bill was filed in this cause by W. A. Titus, a preferred and common stockholder of the Piggly Wiggly Corporation, and was brought by him in his own right and for the use and benefit of such other stockholders of the corporation as may desire to join in the bill.

The suit is treated by all the parties both complainant and the defendant Directors of the Piggly Wiggly Corporation, as having been brought under the "Declaratory Judgment Act," for the purpose of having it determined by the court whether under the facts and the law, the Directors of the corporation would be authorized and warranted in declaring and paying the annual and accumulated dividends on the preferred stock of the corporation issued and outstanding. After the suit was commenced, certain creditors, holding the collateral serial notes of the corporation, issued and executed by the officers of the corporation under certain trust indentures, and secured by 50,000 shares of Class B stock in the Piggly Wiggly Stores Company, Inc., another corporation, the Trustees under the instrument designated as trust indentures, joining in the petition, filed a petition in the cause seeking to intervene and to have their rights declared and decreed.

The original bill is directed against the action of the Directors and Officers of the corporation in declaring a dividend on the outstanding preferred stock of the corporation, alleging that said dividend is unwarranted, and unauthorized because of the financial condition of the corporation. The intervening Trustees and creditors holding the collateral notes adopt the allegations of the original bill, and allege further a verbal or parole agreement or contract contemporaneous with the second trust indenture, by which it is alleged that at the time of the execution of the second trust indenture, and as one of the actuating inducements for the extension of maturities of the collateral notes that it was agreed that the debts would be paid as rapidly as possible out of the earnings of the corporation, and that while the extension for maturities of the collateral notes were stipulated in the supplemental trust indenture, that the oral agreement to the effect that these debts would be paid as early as possible out of the earnings of the corporation, meant that the notes would be paid before the dividends would be declared and paid to the stockholders.

The issues presented by the pleadings submit the questions as to whether the capital stock of the corporation was in fact and in

law impaired at the time the Directors declared and sought to pay dividends on the preferred stock of the corporation; whether there were net earnings from operations out of which certain dividends could be paid; and whether there was a collateral verbal agreement that such dividends would not be paid until the collateral notes held by the intervening petitioners were first paid; and whether the corporation had the legal right to revalue the patent rights, trade name, good will of the corporation purchased by it from Mr. Clarence Saunders and also to revalue the contracts for the operation of stores by limited agents or licensees of the corporation.

A brief history of this corporation, its purposes, charter rights and provisions, etc., as appears from the record will be given.

The Piggly Wiggly Corporation was organized and chartered under the laws of the State of Delaware in July, 1918, and purchased from Clarence Saunders, the owner of certain patent rights, trade name of Piggly Wiggly, and certain limited agency contracts. The original charter of incorporation fixed the capital stock at 6,000 shares of preferred stock of the par value of $100 per share, and 15,000 shares of common stock without par value. In August, 1918, an amendment to the charter was procured, by which amendment no change was made in the authorized capital stock of the corporation, but certain additional provisions with reference to the status of the preferred stock were made. In August, 1919, the charter of the corporation was again amended, and by this amendment an increase in the capital stock was authorized; the preferred stock being increased from 6,000 shares to 20,000 shares of the par value of $100 per share, and the common stock was increased from 15,000 shares to 50,000 shares without par value. In both these amendments certain additional provisions were made with reference to the preferred stock, the dividends to be paid thereon out of profits and earnings of the corporation; the method and plan for retiring the preferred stock, and conditions under which the preferred stock would be retired in annual amounts.

Under the provisions of the charter, and also under the terms of the certificates of preferred stock, the preferred stock would not have voting power, nor the stockholders of the preferred stock would not be entitled to notice of stockholders meetings. It was further provided that in the event of the failure to pay the specified dividends on the preferred stock for two consecutive years that the preferred stock would in that event have the exclusive voting power, and would so continue until all accumulated dividends on the preferred stock had been paid. When this had been accomplished, and all dividends on preferred stock paid, the common stock would be restored to the sole and exclusive voting power and to the control of the corporate affairs as fully as though there had not been any default in the payment of dividends on the preferred stock.

The proceeds from the sale of the 20,000 shares of the preferred stock were first applied to the payment to Clarence Saunders for the purchase price of the patent rights, trade name of Piggly Wiggly, and the royalty contracts, amounting to the sum of $810,-000.00, the consideration for the domestic and foreign patent rights, trade name, contracts, etc., sold by Clarence Saunders to the corporation being $810,000.00 cash and the 50,000 shares of the common stock without par value.

It appears that Clarence Saunders, the then President of the Piggly Wiggly Corporation, conceived the idea of organizing another corporation, and which was organized under the laws of the State of Virginia under the corporate name and style, Piggly Wiggly Stores, Inc. The purpose of this corporation was to operate Piggly Wiggly Stores, doing a merchandising business under the Piggly Wiggly Corporation system, employing the Piggly Wiggly fixtures and equipment and trade name of Piggly Wiggly in operating self-serving stores, and to pay to the Piggly Wiggly Corporation royalties on gross sales as other limited agency licensees. In this connection it will be stated that the Piggly Wiggly Corporation was not a merchandising concern. It owned and operated a manufacturing plant in Jackson, Tennessee, where it manufactured store fixtures and equipment under the patent rights procured by Clarence Saunders and sold by him to the corporation, and these store fixtures were sold to the limited agency licensees with whom the Piggly Wiggly Corporation contracted to operate Piggly Wiggly Stores using the trade name of Piggly Wiggly and the patented store fixtures used in self-serving stores, and for which these licensees paid to the Piggly Wiggly Corporation a royalty amounting to one-half of one percent on gross sales.

The balance of the proceeds realized from the sale of the 20,000 shares of the preferred stock of the Piggly Wiggly Corporation was used in the purchase of 27,508 shares of the Class A stock of the Piggly Wiggly Stores, Inc., and for which the Piggly Wiggly Corporation paid the sum of $1,079,000.71.

In purchasing this amount of Class A stock of the Piggly Wiggly Stores, Inc., by the Piggly Wiggly Corporation, it was evidently intended to provide operating capital for the Piggly Wiggly Stores, Inc., so that the earnings in the form of royalties would be expanded and increased to the Piggly Wiggly Corporation by having an increased number of stores in operation and paying royalties in territory not otherwise covered by licensees of the Piggly Wiggly Corporation, and paying one-half of one percent on gross sales to the Piggly Wiggly Corporation, and also the earnings in the form of dividends anticipated from the Class A stock.

It appears from the financial statements of the Piggly Wiggly Corporation filed as exhibits in the cause, that the business of the corporation proved successful from the beginning, and that the earning power of the corporation materially increased from year to year. The general profit and loss statement, for the year 1920 showed gross revenues, from factory profit, monthly license or royalty fees, initial license fees, interest, dividend on Piggly Wiggly Stores, Inc., stock, aggregating $494,331.87. The total operating expenses for the year 1920 amounted to $81,251.20. Of the aggregate profits for the year 1920 the sum of $251,435.03 was realized from the royalties (license fees). In 1921 the amount received from royalties was $267,242.50; from factory profits $77,437.55; initial license fees and interest $4,152.23; variety store profits $5,537.59, aggregating $344,369.87. It will be noted that in 1921 the receipts from monthly license fees were materially increased over the year 1920, but the profits from the factory operations were materially decreased. In 1922, the receipts from license fees amounted to $310,-923.46 and factory profits $479,215.17, a total from these two sources of $790,138.62. In 1923 the receipts from license fees amounted to $423,407.62, from factory operations $128,914.00, initial license fees $300.00, a total of $552,621.91. This shows a very substantial increase in license fees in 1923 over 1922, but a considerable reduction in profits from the factory.

The profit and loss statement for the year 1924 combines "license fees and factory net profit" into one item of $620,344.43, initial payments, new territory, $5,050.00, making a total from these sources of $625,394.43. The operating expense for the year 1920 was $81,251.20; for 1921, $95,074.27; for the year 1922, including an item of $39,329.64 for advertising and an increase in salary account and legal services, a total of $146,198.92; for the year 1923, total operating expenses $98,190.84; for the year 1924, total operating expenses $69,569.27. For the months of January and February, 1925, the receipts from license fees amounted to $116,940.26, from initial payments, new territory, $900.00, a total from these two sources of $117,840.30. The operating expenses for these two months, January and February, 1925, amounted to $12,131.90.

It will thus be seen from an analysis of the profit and loss statements for each year since 1920, and including 1920, there has been a very substantial increase in the earnings of this corporation from license contracts. The operating expenses have not been increased in the ratio of increased earnings.

These figures of earnings from operations, and expenses of operations, fairly represent the general progress of the Piggly Wiggly Corporation, and reflects the increased earning power of this corporation due principally to the increase in the number of stores being

operated under limited agency or licensee contracts, and the con-
sequent or resultant increase in royalties from this source.·

The only sources of earnings which the corporation has, from
usual operations, is from the royalties received from those operating
Piggly Wiggly Stores under the licensee or limited agency contracts
made with the corporation, and from operating the factory located
at Jackson, Tennessee, in which the fixtures for operating Piggly
Wiggly Self-serve Stores are manufactured. The capital assets of
the corporation consists mainly in the value of the factory and in
the value of the patents, the trade marks and trade name of Piggly
Wiggly, the good will and royalty contracts.

About April 21, 1922, the Board of Directors of the Piggly Wiggly
Corporation gave to the president of the corporation authority to buy
Class A stock in the Piggly Wiggly Stores, Inc., on margin. It
appears that in the late fall of 1922 and during the winter and
spring of 1923 the Piggly Wiggly Corporation through its then Pres-
ident, Mr. Saunders, speculated heavily in Piggly Wiggly Class A
stock, resulting in heavy losses to the corporation.

A meeting of the Board of Directors of the Piggly Wiggly Corpo-
ration held on December 29, 1922, appointed a committee for the
purpose of revaluing, or more properly, fixing a proper value on
certain of properties and assets belonging to the corporation. This
committee was composed of Messrs. Bradford, Smith, Jordan, and
Matthews. This committee on the same date returned its report and
recommendation to the Board of Directors of the corporation. As
this question of the revaluation of the assets of the corporation be-
comes especially material in this case we set out this report, and
the action taken thereon, in full.

"December 29, 1922.

To the Board of Directors of
        Piggly Wiggly Corporation.
Gentlemen:

The undersigned, your committee appointed to consider and re-
appraise the value of certain items carried in the assets of the cor-
poration, beg leave to report as follows:

The item heretofore carried as patents, copyrights, license con-
tracts, etc., $810,000.00, covers the patents and license contracts
from which the earnings of the corporation are chiefly derived, and
is the value first set up when the company was organized, and as
the earnings from such patents and license contracts now substan-
tially exceed the earnings at the beginning of our corporation it
is manifest that said item is far below the value of the patents and
license contracts thus covered.

In view of these facts we believe the value of the patents, li-
cense contracts, etc., covered by the item above named should be
reappraised, and recommend, as follows:

That in lieu of the item now carried under the head—Patents, Copyrights, License Contracts, etc .................$810,000.00 the following two items are substituted:
License Contracts ................................$2,810.000.00
Patents, Copyrights, Trade marks,
Trade names, etc ................................$1,500.000.00
We also note that 50,000 shares of Piggly Wiggly Stores, Inc., Class B Stock is carried at only $5,000.00 in the assets of the Company and believe that this stock should be carried at $30 per share, and, therefore, recommend that there be added to the table of assets the item—
50,000 shares Piggly Wiggly Stores,
Inc., Class B.................................$1,500.000.00
We also recommend that the proper bookkeeping entries be made to incorporate these increased valuations in the assets of the corporation and proper credit therefor given to surplus account.

Respectfully submitted,
R. L. Jordan,
Walter L. Smith,
R. Leedy Matthews,
Clarence Saunders,
E. W. Bradford.

Upon motion of Mr. Lippitt, seconded by Mr. Burch, the report of the Committee was approved."

Referring further to the losses sustained by the Piggly Wiggly Corporation on account of dealing and speculation on margin in Class A stock of the Piggly Wiggly Stores, Inc., it is fairly inferable, if not clearly apparent, from the record, that the loss sustained by the corporation amounting to approximately $2,529.000.00 was sustained during the year 1923, and prior to August, 1923. It also appears from the record that the revaluation of the assets of the corporation as set forth in the above quoted report of the committee appointed by the Directors, occurred on December 29, 1922. It does not appear that any of the losses due from speculation in the Class A stock had occurred at that time. However, we gather from the record that the speculation in this stock by the President of the Piggly Wiggly Corporation, Mr. Clarence Saunders, began in the summer and fall of 1922. We also infer from the record that a considerable portion of this loss had either occurred or was anticipated by the officers of the corporation at the time the $1,000,000.00 loan was negotiated in Nashville, and made the subject of the trust indenture dated February 1, 1923. While the record is not entirely clear as to the exact purposes of negotiating the loan, and executing the trust indenture and executing the collateral notes of that date, we gather from the record that it was for the purpose of protecting

the Class A stock owned by the Piggly Wiggly Corporation and to meet marginal requirements in speculating and dealing in this stock, and perhaps the additional purpose of protecting the Piggly Wiggly Stores, Inc., and in which the Piggly Wiggly Corporation was not only interested as the owner of a large block of the stock, but interested for the further reason of the importance of the success of the Piggly Wiggly Stores, Inc., to the success of the Piggly Wiggly Corporation, as the Piggly Wiggly Stores, Inc., was not only valuable to the Piggly Wiggly Corporation because of the earning of dividends, but also because the Piggly Wiggly Corporation would profit by the operations of the Piggly Wiggly Stores, Inc., by increased royalties to be paid by the Piggly Wiggly Stores, Inc., to the Piggly Wiggly Corporation on gross sales.

We deem it unnecessary in disposing of the questions presented on this appeal to inquire as to how far, if at all, the Piggly Wiggly Corporation was authorized to use the assets of the corporation in this character of speculations. The Piggly Wiggly Corporation had the charter authority to buy stock in another corporation and to own stock in another corporation. It would also have the right to sell stock which it owned in another corporation. It appears from the preamble of the supplemental agreement dated January 8, 1924, which appears as an instrument executed and made supplemental to the original trust indenture dated February 1, 1923, that a suit had been filed in the United States District Court at Memphis, seeking a receivership of the Piggly Wiggly Corporation, and in which suit some attack was made upon the validity of the indebtedness evidenced by the notes for the $1,000,000.00 for the loan obtained from the intervening creditors. It is further recited in the preamble to said supplemental agreement as follows:

"Whereas, said corporation now desires to settle and compromise all differences existing between it, said trustee, and the holders of said notes and other parties interested therein;

NOW, THEREFORE, said corporation acknowledges itself bound for the payment of said notes according to their tenor and effect, upon the maturity of same being extended as hereinafter provided; and further acknowledges and reaffirms the validity of the pledge of said stock for the security of said notes, and acknowledges, ratifies, and reaffirms the validity of each and every provision of said trust indenture, with the exception of the modifications and changes of same as hereinbelow set out and agreed to."

Pursuant to the report of the revaluation committee hereinbefore quoted the general balance sheet of the Piggly Wiggly Corporation dated December 30, 1922, in the list of assets states the "Patents, copyrights, trade marks, etc., $1,500,000." "License Contracts $2,-

811,000.'' In the general balance sheet of December 31, 1921, it appears in the list of assets that the patents, copyrights, license contracts, etc., were carried on the books of the corporation at $810,000. On the balance sheet of the corporation of December 31, 1922, it appears that the patents, copyrights, trade marks and trade names is carried on the books at $1,000,000, and the license contracts at $3,000,000, which shows that the license contracts had been increased in valuation from December 30, 1922, to December 31, 1923, from $2,811,000 to $3,000,000; and that the patents, copyrights, trade name, etc., had been reduced from $1,500,000.00 to $1,000,000.

It is contended for complainant:

1st. That under the laws of the State of Delaware dividends cannot be paid on either preferred or common stock of this corporation if the capital of the corporation is impaired at the dividend paying date.

2nd. That because of the losses sustained by the corporation on account of speculating and dealing in Class A stock of the Piggly Wiggly Stores, Inc., in 1922-23, amounting to about $2,529,000.00, the capital of the corporation had become impaired to the approximate amount of $1,400,000.00, and that this impairment had not been restored at the time the Directors of the corporation sought to declare and pay the dividends on the preferred stock.

3rd. That all losses sustained by the corporation in any of its branches, whether from stock speculation, or from the usual operation of the business, such losses are to be taken into account in arriving at profit and loss for the entire period of the operation of the corporation.

4th. That dividends can only be paid out of the accumulated profits from all sources, and not from the profits earned in the particular year.

5th. That the action of the Directors of the corporation in revaluing and writing up on the books in December, 1922, the patents, trade name, good will and license contracts was unwarranted and illegal, and that the increase in these items could not operate to restore the impairment of the capital of the corporation.

6th. That because of an alleged contemporaneous oral agreement made by Mr. Smith, President of the corporation, with representatives of the intervening trust company and Nashville creditors at the time of the execution of the supplemental trust indenture of January 8, 1924, to the effect that he intended to pay the debts of the corporation as rapidly as possible, was, in effect, an agreement that the corporation would not pay any dividends until these collateral notes held by the Nashville creditors were paid. It being further insisted by appellees that this alleged oral contemporaneous agreement was one of the actuating inducements in pro-

curing the extension of the maturity dates of these unpaid collateral notes.

The Chancellor sustained all these contentions of complainant and the intervening petitioners, The American Trust Company, Trustee, and the creditors, and decreed accordingly. From the decree of the Chancellor defendants have appealed to this court and have assigned numerous errors.

In disposing of the several questions presented by this appeal we will not deal with the assignments of error separately, but will consider and dispose of the questions, collectively, except as it may become necessary to notice certain assignments of error based upon rulings of the Chancellor on questions of evidence.

The first question to be considered and determined is with reference to the action of the Directors of the corporation in revaluing and writing up on the books of the corporation certain intangible assets, consisting of the patents, trade name, good will and limited agency or licensee contracts from the original cost price which the corporation paid for these assets aggregating the sum of $810,000.00, to the increased value of $4,000,000.00, separated into two items; patents, trade name, good will, etc., $1,000,000.00, agency or licensee contracts, from which royalties are received, $3,000,000.00. The learned Chancellor held, for reasons set forth in his written opinion contained in the record, that the corporation would not be authorized or warranted in making this increased valuation of this character of assets.

Without undertaking to review and discuss in detail the numerous cases and authorities cited and relied upon by the respective parties in their exhaustive briefs, we are of the opinion that by the great weight of authority capital assets of a corporation are entitled to be valued at the actual value of the same, and that in arriving at the actual or real value of capital assets as of a given date, the corporation would not be governed solely and entirely by the original or initial cost. Capital assets may be revalued by the officers of a corporation from time to time as the actual value may increase or decrease. 6 Fletcher, page 6101; Whitaker v. Amwell National Bank, 52 N. J. Eq., 400, 29 Atl. 203; Kingston v. Home Life Ins. Company (Dela.) 101 Atl. 898; Gray v. Darlington, 21 L. Ed. (U. S.), 45, and cases cited.

If, therefore, capital assets of this corporation had increased in actual value from the date of the acquisition of the same by the corporation to the date of the declaration of the proposed dividend, we can see no legal objection to a revaluation of such capital assets by the corporation. Not for the purpose of covering a deficit resulting from losses of capital assets, or for the purpose of restoring an impairment of capital, but for the purpose of having the valua-

tion of assets reflect the actual financial condition as of the date of the financial statement. If, however, by a proper revaluation of capital assets which fixes the value at the real or actual value, the fact that a pre-existing or subsequent deficit is covered, or an impairment restored, would not make the revaluation of the assets any the less warranted and legal. We are of the opinion that the books ·of the corporation should be so kept, and all assets so valued, that a balance sheet, when made up, discloses the real financial condition of the corporation. This seems to be the generally accepted rule in America. 6 Fletcher, page 6101; 10 Fletcher, 1921 Supp., page 592; Whitaker v. Amwell National Bank, 52 N. J. Eq., 400, 29 Atl. 203.

However, the actual or real value of capital assets should not be left to mere speculation, nor to an arbitrary valuation intended to cover deficits or to restore impaired capital. ·

To state the proposition differently, before there can be a revaluation or a writing up of assets on the books of the corporation of a tangible or intangible character, there must be a tangible basis upon which the valuation is fixed that is of itself evidential of the actual value of such assets. 14 C. J., page 804.

It is insisted for defendant in the original brief that the royalty contracts (variously referred to in the record as limited agency or licensee contracts) constitutes property that is susceptible to and subject to separate valuations from the patents, trade name, good will, etc. This proposition is denied by appellees. However, in the supplemental brief of appellants it is further contended that if these royalty contracts can not be separately valued that they would be entitled to be considered in determining the actual value of the patents, trade name, good will, etc., owned by the corporation.

We are of the opinion that these royalty or agency contracts are inseparably connected with the patents, trade name, good will, etc., and are not susceptible of a separation for purposes of valuation; that they are of such character as not to be assignable separate and apart from the patents, trade name, etc.

We think the corporation can not properly place a separate valuation on these contracts, separate and apart from the patents, trade name, good will, etc. However, considering that this suit is treated by all parties as a suit under "the Declaratory Judgment Act" to have the court determine the respective rights, powers, duties, and obligations of all the parties, we can see no reason why the corporation should not be directed under the orders of the court to again consolidate these two items, and then place a proper valuation on the patents, trade name, good will, etc. We think the pleadings in the case, where all parties ask at the hands of the court, a declaration of rights, powers, duties and obligations, not merely to meet

the present situation and questions, but for the future guidance of the parties, warrants this court in holding that the corporation is warranted and authorized to correct their method of carrying these items as separate items, and to again consolidate and carry them as a single item on the books of the corporation.

It becomes important to inquire and determine from the, record, applying the general rules as hereinbefore set out, if there has been an actual increase in the value of this character of the, assets of the corporation? Does the record disclose such an increase in the earning power of the patents, trade mark, trade name, good will, etc., of the corporation as to warrant and justify the value placed on these assets by the directors, aggregating $4,000,000.00. (including the estimated value of the contracts). Without going further into an analysis of the general progress of the business of this corporation, and the very apparent increase of the earnings from the royalties, due largely to the increase in the number of these royalty contracts (from about 150 licensed stores at the beginning of the operations of the corporation to approximately 1,700 at the date of the hearing), and from the undisputed showing as reflected in the annual statement of profits and losses covering each several year, beginning with the year 1920 and continuing to the year 1922, the date of the action of the Directors in revaluing these assets, we can not say that these revaluations at the figures were not justified and warranted. It is significant that no fraudulent or ulterior motive in revaluing these assets, had been charged against the Directors in so doing. We think it evident from the record that the special committee appointed to consider the matter of revaluing these assets based their report upon the increased earning power of the patent rights, trade name, good will, etc., of the corporation. It also appears that by charging off the losses of about $2,529,000.00 it would result in an impairment of the capital of the corporation of about $1,043,000.00. It would further appear that if by a revaluation of the assets and increasing the same by only about $1,043,000.00 there would not be an impairment of the capital.

We are of the opinion, however, that any increase in the value of these assets can not be considered surplus out of which dividends could be paid, since it appears that the surplus so created has not been realized. We think it the clear intention of the Delaware Act, as interpreted by the Delaware Courts, to provide for the payments of dividends out of realized earnings or profits only. We may add that we think it is also true that dividends could be paid, as a general proposition, out of surplus created from the increased value of assets, where the increase in valuation is properly made so as to reflect the actual value, provided the increased profits from such source have been actually realized from the surplus thus created,

and in which the capital is left unimpaired. We do not think any dividends either to preferred or common stock may be declared and paid out of surplus arising from increased value of capital assets, until the profit has actually been taken and realized.

"An appreciation in value of assets may be taken into account in determining whether or not a profit has been made, and may be distributed as dividends in the same manner as profits arising from earnings, where such appreciation has been actually realized." 7 R. C. L., Sec. 261, p. 284. Roberts v. Roberts-Wicks Co., 184 N. Y. 257, 3 L. R. A. (N. S.), 1034.

"But a conjectural increase in the value of land held by the company can not be considered as a part of its income for the purpose of dividends; nor can profit which the company expects to make from contracts on hand for future deliveries of the product not yet made by it, from raw material not yet purchased." R. C. L., Sec. 261, p. 284, and cases cited.

Counsel for both parties in the elaborate and excellent briefs have discussed at considerable length, and have cited many authorities in support of their respective contentions on the question of the effect that a revaluation of assets would have on losses sustained by the corporation. It would appear that by a revaluation of the capital assets of the corporation as was done in the instant case that a surplus was created. The admitted losses of $2,529,000.00, when charged against the assets and surplus, would still leave the capital stock of the corporation unimpaired, if the figures at which these capital assets were revalued are permitted to stand. This would result in having these losses absorbed by the surplus, and would operate, of course, to a reduction of the surplus by the amount of the losses charged against the surplus. If this can be done it would simply result in having the balance sheet of the corporation as of the date of the charging off of these losses against surplus, show the actual financial condition of the corporation at the date the losses are sustained and charged to the account of losses.

It is contended for the appellees that under the Delaware law, and Sections 34 and 35 thereof, that dividends can only be paid on either preferred or common stock out of accumulated profits from the operations of the business, after charging against the accumulated profits the accumulated losses. As we understand the contention to be that for the period covering the entire operations of the corporation the profit and loss account must show an accumulation of profits, or earnings in excess of losses, sufficient to pay the dividends.

It is contended for appellants that dividends can be paid under the Delaware law out of surplus and accumulated profits if the balance sheet shows assets in excess of liabilities sufficient to pay the dividends.

Without reviewing the authorities, pro and con, the conclusion we reach is that surplus created by revaluation of the assets can not be used for the payment of dividends, unless the surplus from the revaluation of the capital assets represents a realized profit. In other words, if the revaluation of the assets has resulted in the creation of a surplus over liabilities such surplus would operate to liquidate losses, or for the absorption of losses, but until a profit to the corporation has been actually realized on this revaluation of the assets so much of the surplus of the corporation as has been built up or created because of the revaluation of assets could not be used, or considered as accumulated profits and surplus out of which dividends could be paid.

On the other hand, we think that if the losses sustained by the speculation and dealing in the Class A stock have been charged against the surplus of the corporation, and after so doing the capital remains unimpaired, that the corporation could pay dividends out of accumulated earnings of the corporation, and the corporation would not be required to charge the losses against the earnings, since the losses have already been properly charged against the surplus, leaving the capital stock unimpaired. In this view of the case we think the corporation would be warranted in paying dividends, at least to the preferred stockholders, out of the accumulated profits from the operations of the business.

This conclusion, we think, is not contrary to the construction placed upon Sections 34 and 35 of the Delaware Law by the Courts of Delaware, in either the case of Peters v. U. S. Mortgage Co. (Del Chy.), 114 Atl. 598; Kingston v. Home Life Insurance Co. (Del. Chy.), 111 Atl. 898.

Whatever the rule may be in England with reference to the necessity of restoring circulating or floating assets before a dividend can be paid, we think the rule in America is as above set forth. Goodnow v. American Writing Paper Co., 72 N. J. Eq. 645. (See the general rule in the United States 14 C. J., 802, Sec. 1213.)

Appellants contend that because of an alleged contemporaneous oral agreement made by Mr. Smith, President of the Piggly Wiggly Corporation at the time of the supplemental trust indenture of January 8, 1924, to the effect that he would pay the debts of the corporation (having special reference to the debts of the intervening creditors), as rapidly as possible, was construed and understood by the parties to mean that he would discharge the debts represented by the collateral notes and made the subject of the trust indenture, before paying any dividends; that this agreement upon the part of Mr. Smith was an actuating inducement in having the intervening creditors agree to the extension of the dates of maturities of the collateral notes. All the evidence with reference to the alleged oral

agreement was excepted to by defendants, and the action of the court in overruling the exceptions to this evidence is made a basis of an assignment of error by appellant on this appeal.

It is contended for appellants that this evidence was incompetent on the ground that oral contemporaneous evidence is inadmissible to alter, vary or change a written agreement. If this alleged oral agreement made contemporaneously with the execution of the supplemental trust indenture had the effect of altering or changing the written agreement the exception should have been sustained. It appears that during the negotiations for the extension of the maturity dates of these collateral notes and before the supplemental trust indenture growing out of these negotiations was executed by the parties, Mr. Smith stated that he was a ''debt-payer and that he would pay these notes as early as possible;'' that at the same time he made some figures of the anticipated earnings from the operations of the corporation. The original trust indenture dated February 1, 1923, in Section 7 of Article 4 thereof, provides as follows:

> ''Section 7. That the corporation will not pay any dividend upon its outstanding common stock exceeding $8.00 per annum, and that it will pay no dividend upon its outstanding common stock unless the amount necessary to pay such dividends had actually been earned by the corporation during the three months period next preceding the date such dividend is actually to be paid.''

The supplemental agreement of January 8, 1924, in the first paragraph of the preamble, after referring to the original indenture of February 1, 1923, recites ''and this supplement is to be treated and considered as a part thereof as if originally executed and signed simultaneously therewith.'' It further recites as follows: ''and further acknowledges and reaffirms the validity of the pledge of said stock for the security of said notes, and acknowledges, ratifies and reaffirms the validity of each and every provision of said trust indenture with the exception of the modifications and changes of same as are hereinbelow set out and agreed to.''

We think the legal effect of this alleged oral contemporaneous agreement is that Mr. Smith agreed to pay these collateral notes as rapidly as possible, but not to be construed as meaning that he would suspend the payment of dividends on the preferred stock until these collateral notes were all discharged.

We think this evidence was competent to support the oral contemporaneous agreement to the effect that he would pay these debts as soon as possible, meaning earlier than the extended maturity dates if the corporation could do so out of its earnings without violating other obligations. Such an agreement would not be in con-

flict with any of the written provisions of the supplemental written agreement. However, if the language should be construed to mean that he would suspend the payment of dividends out of earnings which could otherwise be properly applied to the payment of dividends on preferred stock, would be in conflict with Section 7 of Article 4 of the original trust indenture, and would amount to changing or altering a valid written stipulation by a contemporaneous oral agreement.

Taking into consideration the circumstances and conditions under which this statement was made by Mr. Smith, and a fair interpretation of the words actually used, we think that if it amounted to an additional contractual agreement at all, that it could only be construed to mean that the corporation would pay these collateral notes as fast as the earnings of the corporation would permit; and that the earnings of the corporation would be applied to the payment of the collateral notes, even before the extended maturity dates, if the same could be done with due regard to other obligations of the corporation.

We do not find anything in the language nor in the circumstances surrounding the transaction that would warrant the construction, that this oral agreement was to the effect that payment of dividends on preferred stock would be postponed or deferred until these collateral notes had been paid. If the language is to be given that interpretation then the evidence would be incompetent, because it would be oral evidence tending to alter or vary the written terms of the trust indenture.

The inducement and consideration for the extension of the maturity dates of the collateral notes is correctly set forth in the preamble of the supplemental agreement, and which is in the following language:

"WHEREAS, on the 17th day of August, 1923, suit was filed in the Federal Court at Memphis, Tennessee, seeking a receivership of said corporation, and among other things suggesting the invalidity of the indebtedness evidenced by said notes and the pledge of said stock as security therefor, in which suit the Trustee filed an intervening petition which was thereafter answered by the Corporation resisting the payment of said notes; and

WHEREAS, said Corporation now desires to settle and compromise all differences existing between it, said Trustee, and the holders of said notes and other parties interested therein:

NOW, THEREFORE, said Corporation acknowledges itself bound for the payment of said notes according to their tenor and effect, upon the maturity of same being extended as herein-

after provided; and further acknowledges and reaffirms the validity of the pledge of said stock for the security of said notes, and acknowledges, ratifies, and reaffirms the validity of each and every provision of said trust indenture, with the exception of the modifications and changes of same as hereinbelow set out and agreed to.''

Section 2 of the Supplemental Agreement is in the following language:

SECTION 2. The remaining 193 notes shall immediately be endorsed by the Trustee so as to indicate that the maturities of same shall be on or before the dates hereinafter set out, after January 1, 1924, as to the following amounts:

$200,000.00 on or before one year;
$200,000.00 on or before two years;
$300,000.00 on or before three years;
$265,000.00 on or before four years.

We are of the opinion, therefore, that this alleged parole contemporaneous agreement can not be construed to mean that the corporation is under contractual obligation to pay these collateral notes before the extended maturity dates, before paying dividends on the preferred stock out of the earnings of the corporation.

This brings us to the question as to whether or not the Piggly Wiggly Corporation, at the time the Directors ordered payment of the dividends on the preferred stock, then had accumulated profits and surplus out of which it could pay the accumulated dividends on the preferred stock.

When we speak of ''accumulated surplus and profits'' we do not intend to include surplus created by a revaluation of the assets after charging off the losses of the corporation, since it appears from the record in the case that any surplus created by a revaluation of the assets has not been turned into profit as hereinbefore discussed in this opinion. Hence for the purposes of this case we may inquire as to whether or not the accumulated profits of the corporation is sufficient to pay the dividends after deducting operating expenses and all accounts and bills then due and owing by the corporation, including interest and payments due on the collateral notes.

It appears from the exhibits filed in the cause in the form of statements of profit and loss from operations that the accumulated profits or earnings of the corporation amounted to approximately $600,000.00, and after deducting all items and reserves for taxes to be paid out of the accumulated profits or earnings there would remain an amount in excess of the accumulated dividends of about $220,000.00 on preferred stock. This would be true only in the event these collateral serial notes are to be considered not yet due.

We are of the opinion that by the terms and provisions of the supplemental agreement, referred to as the supplemental trust indenture, the maturity dates were extended over a period of four years. It appears from the record that the interest and payments on the principal are being met and paid by the corporation as the same become respectively due and payable according to the terms and provisions of the supplemental indenture or agreement.

As stated heretofore in this opinion, we do not hold that the corporation would be entitled to pay dividends out of earnings if there is an impairment of the capital stock on the date that the dividend is declared, and we have already stated in this opinion the financial condition in which the financial affairs of the corporation shall be before the corporation would be legally warranted in paying dividends on its preferred or common stock. We do not think that any stipulation or provision contained in the preferred stock certificate issued under the authority of a charter under the Delaware laws of incorporation would entitle the corporation to pay dividends on the preferred stock or common stock if at the time the capital of the corporation is impaired. We have examined the cases cited by the respective parties, and the independent investigation made by the court brings us to the conclusion that even preferred stockholders of the corporation, whether residents of the state granting the charter or not, are charged with notice of the limitations placed upon the authority of the corporation with reference to the payment of dividends on its outstanding stock. While there is some authority to support the contention of the appellants in this case to the effect that "a citizen of a state, in dealing with a foreign corporation, may rely upon the act of the incorporation in reference to its apparent powers, and is not chargeable with notice of the general laws of the state by which it was created restraining the powers of corporation, unless it be shown that he had actual notice of such laws." 8 Fletcher Cyc. of Cor., p. 9346. An examination of the cases and authorities cited in support of this contention are in no essential respect analogous to the instant case. Fletcher (8 Vol. Cyc. Cor., p. 9346) states the general rule to be:

"It is a well-established rule that when a corporation organized by one state is authorized by the laws of another state to do business in the latter, it carried with its charter and the law under which it is incorporated, and persons dealing with it, particularly those who are members of the association or corporation, are bound to take notice of the provisions for control of its affairs and the scope of authority of its officers and agents, and especially of the business in which it can engage."

From the examination which we have made of the cases cited by appellants, we fail to find anything from these cases to support the

contention of appellants on this question. We deem it unnecessary to discuss in this opinion the particular questions involved in the respective cases cited in the brief of appellants with reference to the rights of stockholders of preferred stock to have the provisions in the certificates of preferred stock held to be a contractual obligation upon the part of the corporation to pay dividends on the preferred stock out of the earnings of the corporation, where the payment of such dividends under such conditions is not authorized by the laws of the state granting the charter. Suffice it to say that the cases cited and which we have examined do not present this question, and can not therefore be relied upon for the contention of appellants. However, in the view of the case we have already taken as hereinbefore set out, this question does not become material, because we think that by authorizing and sustaining the action of the Directors of this corporation in revaluing the capital assets of the corporation, and by permitting the revaluation as made to stand, there is no actual impairment of the capital stock of this corporation. Also that the corporation could legally pay the proposed dividend out of the accumulated profits of the corporation, which appear to be sufficient without considering any surplus created by a revaluation of the capital assets.

It is not now insisted in this case by the corporation that dividends could be properly declared and paid on the common stock of the corporation in its present financial condition. However, because of the express request of the parties to the cause that all the rights of all the parties be declared by the court for the future guidance of the officers of the corporation, and because the pleadings in this case are treated as a suit under the "Declaratory Judgment Act," we deem it proper to state the effect of the holdings of the court as set forth in this opinion on the right of Directors to declare and pay dividends on the common stock.

It is stated that the distinction between preferred stock and common stock in the matter of dividends is that, all stipulated dividends as provided in the preferred stock certificate shall be paid before any dividends can be paid on the common stock. This, however, is not the only distinction to be made between these two classes of corporation stock. The preferred stock of the class authorized by the charter of this corporation cannot enhance in value, but little, if any, over its par value, as its earning power is specifically limited to 8% per annum (cumulative). The preferred stock is subject to retirement by the corporation in annual allotments, and in no event can it receive more than 1.05, since the corporation has charter authority to make annual retirements of its preferred stock at not exceeding that figure. Again, it makes no difference how well the corporation may succeed financially, or how great the profits and

earnings that may arise from its operations, the common stock alone is entitled to all net earnings and profits, and such surplus as may be built up by the corporation after the dividends have first been paid to the preferred stock. The preferred stock does not have any voting power or voice in the conduct of the affairs of the corporation (except in the event of default in the payment of dividends.)

While preferred stock can not be classed as a debenture, or a bond or a debt, yet there are certain contractual rights and obligations specified and set forth in the stock certificate, and authorized by the charter and laws under which the same is issued, which entitles this class of stock to special consideration at the hands of the corporation in the matter of paying the stipulated annual and cumulative dividends. The Directors of the corporation have less discretion in the matter of declaring and paying dividends on preferred stock than on common stock. If the corporation shows earnings and profits out of which dividends on the preferred stock may be lawfully paid, the holders of preferred stock have the contractual right to demand and receive dividends as stipulated in the certificate of stock, provided, there is no impairment in the capital stock, and other legal obligations of the corporation are met.

In the matter of declaring and paying dividends on the common stock the Directors of the corporation may exercise a broader discretion. Even where there are earnings and profits out of which a dividend could be lawfully paid on the common stock, the Directors of the corporation, if they deem it to the best interest of the corporation, may withhold declaring a dividend on the common stock, or could reduce the amount of the dividend, so that a better surplus could be built up, or the business of the corporation be thereby expanded. In other words, the Directors of the corporation could not be required to pay out the profits, earnings or surplus in dividends on the common stock, even though the financial statement of the corporation would show earnings or profits or surplus out of which it could be legally paid. On the other hand the holders of the preferred stock would, under the same conditions have the moral and in some instances, legal right to demand the payment of dividends as stipulated in the stock certificate.

The matter of paying dividends by a corporation, especially on the common stock, is within the sound discretion of the Directors, and this discretion is not subject to the direction of the courts, except in the case of a clear abuse, and so long as the Directors of the corporation are acting within the lawful limits prescribed by the charter and the laws of incorporation under which the corporation is acting the courts can not interfere. In this case the court would not be warranted in giving any opinion or expression as to the duties of the Directors of the corporation in the matter of the

payment of the dividends for the future, but we deem it proper only to state the general rules under which such dividends may be paid as set out in this opinion.

The only other question remaining to be disposed of is with reference to the rights of the American Trust Company, Trustee, and the creditors joining in the intervening partition (referred to as the Nashville creditors, the holders of the collateral notes under the trust indenture), to file the petition and intervene in this case.

We are of the opinion that these intervening petitioners, and especially the American Trust Company, were clearly within their rights under the terms and provisions of the trust indenture, both the trust indenture of February 1, 1923, and the supplemental indenture or agreement of January 8, 1924, to intervene in the case, and especially since we hold that the oral contemporaneous agreement made by Mr. Smith in connection with the execution of the supplemental trust indenture, should be construed as an agreement upon the part of the corporation to pay the collateral notes as early as possible, even before the extended maturity dates, if the earnings of the corporation after meeting operating expense, current obligations, and dividends on the preferred stock would warrant the accelerated payment, or payments on these collateral notes.

We are further of the opinion that under the provisions and stipulations of the original and supplemental trust indenture that these petitioners are entitled to have the necessary expenses, including reasonable attorney's fees, allowed and paid by the corporation.

It therefore results that the decree of the Chancellor is reversed as to all matters except the matter of decreeing the expenses and attorneys fees to the American Trust Company, Trustee, and the petitioning creditors joining in said petition, and the case is remanded to the Chancery Court of Shelby County to the end that an order of reference made in the cause by the Chancellor for the purpose of determining the amount of the said expenses and reasonable attorney's fees to be allowed and paid to said intervening petitioners.

The cost of this appeal and the cost of the cause will be paid by the original complainants and the sureties on the cost and appeal bond of original complainants, and for which execution may issue.

Heiskell and Owen, JJ., concur.