George M. THOMAS, Reuben Thomas, William B. Thomas, Aaron R. Thomas, Stephen J. Thomas, Celeste Thomas, Joan Ellen Thomas, Gael Thomas, Martin J. Thomas, Susan B. Goldman, Susan B. Goldman as Custodian under U.G.M.A. for Daniel Goldman, Susan B. Goldman as Custodian under U.G.M.A. for Noah Goldman, William B. Thomas as Custodian under U.G.M.A. for Edward Seth Thomas, William B. Thomas as Custodian under U.G.M.A. for Philip Shale Thomas, and William B. Thomas as Custodian under U.G.M.A. for Eileen Thomas, Plaintiffs,

v.

GENESCO, INC., Defendant.

No. 76 Civ. 3094 (PNL).

United States District Court,
S. D. New York.

July 18, 1980.

Arthur L. Liman, Doris Carroll of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs.

Michael H. Diamond, Jerome S. Hirsch of Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVAL, District Judge.

George M. Thomas and other members of his family ("plaintiffs" or "the Thomases"), all holders of a junior preferred stock of the defendant, brought this action against Genesco, Inc. ("defendant") alleging breach of contract and violation of the terms of the preferred stock. The plaintiffs contend that Genesco breached its obligation to redeem, and pay dividends on, preferred stock which was issued to the plaintiffs in 1968 in consideration for the transfer to Genesco of the assets of Susan Thomas, Inc. ("Susan Thomas"). The defendant contends that its promise to the plaintiffs was conditioned by provisions in the acquisition agreement and corporate charter which forbid dividend payments and redemptions on junior stock when payments have been suspended or are in arrears on senior stock.

Underlying the dispute are the serious changes in economic conditions that occurred between the time that Genesco agreed to take over Susan Thomas in 1968, in the twilight of the intoxicating "buy now, pay never" conglomerate acquisition markets of the 1960's and the time when the plaintiffs sought unsuccessfully to redeem their Genesco stock, during the sober hangover of the mid-1970's. The parties had expected that the circumstances which fueled Genesco's ambitious acquisition program would continue indefinitely; little attention was paid either in the process of negotiations or in the documents embodying the agreement to what would happen if Genesco's fortunes soured.

Not surprisingly, the parties now profess widely divergent understandings of their respective rights and liabilities under their 1968 agreement. And the documents, structured in optimism, are not particularly helpful as to the consequences of bad times.

### I

*Background*

The facts, most of which were stipulated by the parties before trial, are as follows.

The plaintiffs are citizens of New Jersey, New York, or Massachusetts. The defendant Genesco is a Tennessee corporation which has its principal place of business in Nashville, and does business in this District.[1]

The plaintiffs own, in the aggregate, 91,650 shares of Subordinated Serial Preferred Stock, Series 2 ("Series 2 preferred") of defendant Genesco, which amounts to 55.4% of the outstanding shares of Series 2 preferred. SF3.

---

1. In the pre-trial order, the parties agreed that jurisdiction was properly based on diversity of citizenship, and that venue lies in this District, in which the defendant is doing business. It further appears that this action is governed by the law of Tennessee, which is the law of the place where the defendant is incorporated.

In 1968, plaintiffs George M. Thomas, Reuben Thomas and William B. Thomas were the principal shareholders and chief executive officers of Susan Thomas, Inc., a New York corporation engaged in the manufacture and distribution of women's sportswear and apparel. SF4.

In 1968, the principal business of Genesco and its subsidiaries was the manufacture and sale of apparel. During the period 1962 through 1967, Genesco acquired various manufacturing and retailing concerns in exchange for its stock. Among the companies acquired for Genesco stock during this period were Girltown, Inc., Camp and McInnes, Inc. and Berkshire Apparel Corp. SF5–6.

In February 1968, Leonard Guiler, an officer of Genesco, approached George Thomas and suggested that Genesco might be interested in acquiring Susan Thomas. Trial Transcript ("T") 69. George Thomas testified that he insisted that he deal directly with W. Maxey Jarman, President of Genesco, and a meeting with Jarman was arranged. *Id.* At the meeting on March 21, Jarman told Thomas that Genesco was interested in acquiring Susan Thomas, and was contemplating a "package" worth approximately $20 million. Thomas acknowledged to Jarman the seriousness of the figure Jarman had mentioned, but noted his disappointment that what was offered was not cash. He returned to discuss the matter with his brothers. T 76–77, 81.

Thomas later met with Jarman and other Genesco representatives to negotiate further the terms of Genesco's offer. Thomas again expressed a preference for a cash deal but was told that the tax consequences of a cash purchase would have a negative impact on Genesco's balance sheet. Genesco said it would offer Susan Thomas shareholders a junior preferred stock. T 84. Thomas repeated his desire for assurance that he and his family "would get paid." T

89. The parties finally arrived at a mechanism which appeared to respond both to Thomas's concern for security and to Genesco's interest in a non-cash, "pooling of interests" transaction. Genesco would issue to the selling shareholders of Susan Thomas a subordinated serial preferred stock carrying the following terms: for five years, the stock would be non-callable but it would be redeemed at the rate of at least 20% per year by sinking fund payments during the following five years. In each of the second five years, furthermore, Genesco would have the right to redeem amounts larger than 20% up to 100% of the outstanding shares. The redemption price was to be $40 per share in the first year of the redemption period, but was to increase to $45 per share in the second year and by an additional $2 per share in each succeeding year. The purpose of the latter provision was to give Genesco an incentive to redeem earlier rather than later during the five years allowed for redemption. T 102–03. Whether Genesco's obligation to redeem during the second five year period was absolute, whether it was subject to charter provisions suspending such payments in certain conditions, and if so, in what circumstances, are the central issues in this lawsuit.

### The Plan

On or about May 29, 1968, Genesco and Susan Thomas entered into a written Plan of Reorganization and Agreement (the "Plan") dated May 29, 1968. The Plan provided that Susan Thomas was to transfer to Genesco substantially all of the assets, rights, property and business of Susan Thomas, and Genesco was to deliver to Susan Thomas shares of Genesco's Subordinated Serial Preferred Stock, Series 1 and Series 2, as well as common stock, to be distributed in turn to Susan Thomas shareholders.[2] SF 8–9.

---

**2.** In the Reorganization Agreement (the "Plan"), the parties agreed that Susan Thomas shareholders would receive one of two packages of Genesco securities: a combination of common stock plus: Subordinated Series 1 Preferred; or, Subordinated Series 2 Preferred. The Series 1 Preferred was convertible into common stock; the Series 2 Preferred was nonconvertible, with a fixed price for ultimate redemption.

The Thomas brothers all elected Series 2 Preferred, and they and the other plaintiffs have brought this action solely upon their rights as Series 2 shareholders.

The Plan provided that this preferred stock would have redemption provisions as described above. This was embodied in the following provisions of the Plan.

Paragraphs 1.8 and 1.9 of the Plan describe the Series 2 preferred stock (to be delivered in exchange for Susan Thomas shares) as follows:

1.8. Genesco shall cause a meeting of its shareholders to be duly held for the purpose of amending its Charter of Incorporation . . . (ii) to authorize creation of the Genesco Series 1 Preferred Stock and Series 2 Preferred Stock to be delivered hereunder. Said stock shall be subordinate solely to Genesco's $4.50 Cumulative Convertible Preferred Stock and Classes A, B and C of its Subordinated Cumulative Convertible Preferred Stock; shall have the distinguishing characteristics and rights, privileges and immunities described in Exhibit C; and shall be preferred as to dividends and liquidation to the remaining authorized but unissued series of preferred stock of Genesco.

\*   \*   \*   \*   \*   \*

"(b) The Series 2 Preferred Stock shall be non-callable until the first day of the month following the fifth anniversary of the Closing after which it shall be redeemable at $40 per share at the option of Genesco by not less than 30 or more than 60 days' notice of call, until December 31, 1973, at $45 per share until December 31, 1974, and at prices which shall increase thereafter by $2.00 per year, until all such stock shall have been redeemed; (ii) shall be entitled to cumulative dividends, payable quarterly, at a rate equal to 6% of the then prevailing redemption price; (iii) shall be entitled to receive the then prevailing redemption price, including accumulated dividend arrears, before distribution to subordinated classes of stock upon the voluntary or involuntary liquidation of Genesco; and (iv) shall be entitled to one vote per share on all matters.

"1.9. The Genesco Charter amendment, substantially in the form attached as Exhibit C, shall require Genesco to create and fund, in cash or United States government obligations, a sinking fund commencing January 1, 1974, which will redeem and retire, pro-rata, 20% of the original outstanding shares of Series 2 Preferred Stock within one year thereafter, and do the same with respect to a like number of shares annually thereafter, until all of the Series 2 Preferred Stock shall have been redeemed, at the respective redemption prices then prevailing. Upon failure to timely effect any such funding or redemption, and during the pendency of any such default, Genesco shall be precluded from purchasing, redeeming, or otherwise acquiring for value or paying any dividends to the holders of its common stock and its other classes of preferred stock subordinate to Series 1 and Series 2 Preferred Stock."

SF 10.

### The Creation of the New Issue

Effective July 8, 1968, the Genesco certificate of incorporation was amended so as to authorize the issuance of Subordinated Serial Preferred Stock. The July 8 amendment delegated to Genesco's Board of Directors the power to fix and determine the distinguishing characteristics of each series of Subordinated Serial Preferred Stock. Pursuant to this delegation, the Genesco directors on July 29, 1968 determined the characteristics of Series 2 preferred stock, inserting a new Part C–III in the Fourth Article of the corporate charter. Part C–III reads in pertinent part:

(3) *Redemption.* The Corporation may, subsequent to October 31, 1973, at the option of the board of Directors, redeem the Series 2 Serial Preferred Stock or, from time to time, any part thereof at the redemption prices hereinafter set forth, plus in every case an amount equal to all accumulated and unpaid dividends accrued to the redemption date on the shares redeemed, whether or not earned or declared. The redemption price for each share of Series 2 Serial Preferred Stock redeemed at the option of the

Board of Directors or pursuant to the Sinking Fund shall be $40 if redeemed prior to January 1, 1974, and $45 if redeemed in the calendar year 1974 and shall increase by $2 per annum for each calendar year thereafter.

(4) *Sinking Fund.* (a) So long as any shares of Series 2 Serial Preferred Stock shall be outstanding, and as and for a sinking fund for the redemption of shares of Series 2 Serial Preferred Stock, the Corporation shall, on or before January 1, 1974, and each January 1 thereafter, deposit or cause to be deposited in trust with some bank or trust company organized and doing business under the laws of the United States of America or the State of New York and having capital surplus and undivided profits aggregating at least Ten Million Dollars ($10,000,-000) and having its principal office in the Borough of Manhattan, The City of New York, an amount of money sufficient to redeem 20% of the shares of Series 2 Serial Preferred Stock originally issued or outstanding on the sinking fund payment date, whichever is greater, at the redemption price stated in Section (3) of this PART C–III prevailing during the calendar year in which such sinking fund payment is required to be made.

"(b) Moneys deposited in the sinking fund shall be applied on a pro rata basis to the redemption of shares of Series 2 Serial Preferred Stock during the calendar year in which such sinking fund payment is required to be made. Until so applied such moneys may, at the option of the Corporation, be invested in obligations issued or guaranteed by the United States Government.

"(c) Any interest earned on moneys deposited in the sinking fund shall be paid to the Corporation free of any trust." SF 11.

### Charter restrictions on preferred dividends and redemptions

At the time of the Thomas negotiations, Genesco had in existence several issues of preferred stock which, upon issuance of the Thomas stock, would be senior to it.[3] For each such preferred issue, the Genesco corporate charter contained a provision designed to prevent Genesco from paying any dividends or other distribution or making any redemptions on any more junior (or equal ranking) issue, at any time when Genesco would be in default on any obligation owed to the preferred issue in question (or to any other issue ranking senior or equal to it).[4] Upon the authorization of each preferred series, a similar provision had been incorporated into the charter to protect such new issue against preferential payments made on any more junior (or equal ranking) issue.

When the charter amendments authorizing the Thomas issue of Series Preferred Stock were passed in July 1968, a similar provision, Article Fourth, Part C–III(3)(f), was adopted for its benefit.[5]

| | |
|---|---:|
| **Subordinated Serial Preferred** | |
| $2.30 Series 1 | 89,330 |
| $2.40 Series 2 | 220,640 |
| $4.75 Series 3 | 80,055 |
| $4.75 Series 4 | 65,645 |
| $4.75 Series 5 | 119,870 |
| **Subordinated Cumulative Preferred** | 105 |
| **Employees' Subordinated Convertible Preferred** | 1,358,125 |

4. *See* Defendants Exhibit ("DX") 32, Article Sixth, Part B–1(3).

5. That provision reads as follows:

(3) *Redemption*

\* \* \* \* \* \*

"(f) If at any time the Corporation shall have failed to pay dividends in full on all shares of

---

3. Genesco has issued and outstanding approximately 12,400,000 shares of common stock, $1 par value, and eleven different series of preferred or preference stock with annual dividends requirements aggregating to in excess of $3 million. The outstanding series of preferred and preference stock are as follows:

| Name | Approximate Number of Shares Outstanding as of 3/20/75, the Date of Suspension of Dividends described above |
|---|---:|
| $4.50 Cumulative Convertible Preferred | 19,950 |
| Subordinated Cumulative Convertible Preference | |
| $4.25 Series A | 600 |
| $6.00 Series B | 122,170 |
| $6.00 Series C | 129,000 |

### Note Agreements Containing Covenants Against Payment of Preferred Dividends and Redemptions

By a note agreement dated February 16, 1961, Genesco had borrowed $20 million from approximately 25 lenders (the "1961 Note Agreement"). On July 15, 1964, Genesco had borrowed approximately $40 million from approximately 20 lenders (the "1964 Note Agreement"). Provisions of the 1961 and 1964 Note Agreements imposed certain restraints upon Genesco's payment of dividends or other distributions if, after giving effect to such payments, Genesco's Consolidated Net Tangible Assets would be less than 275% of Consolidated Funded Indebtedness (the "275% test") or Consolidated Net Current Assets would be less than 200% of Consolidated Funded Indebtedness (the "200% test"). Breach of these covenants would result in default under these Note Agreements. Such a default would have triggered defaults as to other Genesco debts. SF 16.

### The Conclusion of the Acquisition

Copies of the proposed amendments to Genesco charter were annexed as exhibits to the proxy statement dated July 5, 1968 distributed by Susan Thomas to its shareholders in connection with the approval of the May 29, 1968 Plan. SF 13.

The proxy statement sent to Susan Thomas shareholders included the following language:

> GENESCO shall not purchase or redeem any shares of any class of stock so long as it has failed to pay dividends in full on any class of stock senior thereto. Certain restrictions on the payment of dividends on Genesco capital stock and on the acquisition of the Company's promissory notes are provided for in the loan agreements under which the Company's promissory notes were issued. On April 30, 1968, the amount of earnings retained in the business free of all such restrictions was approximately $43,000,000.

DX 101 (at 13).

On or about September 13, 1968, the Thomas brothers exchanged their Susan Thomas stock for 65,520 shares of Genesco common stock and 54,600 shares of Series 2 preferred. The series 2 preferred stock certificates received by the Thomas brothers carry a printed notice that reads in pertinent part:

> The shares represented by this certificate may be redeemed at the option of the Corporation at any time on or after

Serial Preferred Stock of such Series outstanding, on all shares of Convertible Preferred Stock, of such Series outstanding, on all shares of Convertible Preferred Stock, Subordinated Preference Stock of each Series and each other class of stock of the Corporation, including shares of Serial Preferred Stock of other Series, ranking as to dividends or assets prior to or equally with the Serial Preferred Stock of such Series, or shall be in default in respect of its obligations under any sinking fund or purchase or redemption account for the purchase or redemption of shares of Serial Preferred Stock of such Series and any such senior or *pari passu* stock, then and until all arrearages of such dividends for all preceding dividend periods and for any current dividend period or periods shall have been paid, or declared or set apart for payment, and all defaults under all such sinking funds or purchase or redemption accounts shall have been remedied, neither the Corporation nor any subsidiary shall purchase or redeem, at the option of the Board of Directors or pursuant to the provisions of any such sinking fund or purchase or redemption account (except, if all such dividend arrearages shall then have been paid or provided for, to the extent required to cure such defaults in such sinking funds or purchase or redemption accounts, in amounts proportionate to the amounts due respectively thereunder), or otherwise acquire for value any shares of Serial Preferred Stock of other Series, ranking as to dividends or assets equally with or junior to the Serial Preferred Stock of such Series, and the Corporation shall not declare or pay any dividend or make any other distribution on any shares of such junior stock."

SF 12.

Genesco's attorneys misinterpret this provision, arguing that its function is to bar payments to the Thomas issue while more senior issues are in arrears. In fact, that office is performed by parallel prior provisions passed as a part of the creation of the more senior issues; this provision is designed to protect the new issue against future more junior shares receiving preferential payment or redemption.

November 1, 1973, at prices per share, plus in every case accumulated dividend arrears, of $40 if redeemed prior to January 1, 1974 and $45 if redeemed in the calendar year 1974, and at prices per share increasing by $2 per annum for each calendar year thereafter.

So long as any shares of Series 2 Stock shall be outstanding, as and for a sinking fund for the redemption of shares of Series 2 Stock, the Corporation shall, on or before January 1, 1974, and each January 1 thereafter, deposit or cause to be deposited in trust an amount of money sufficient to redeem 20% of the shares of Series 2 stock originally issued or outstanding on the sinking fund payment date, whichever is greater, at the redemption price prevailing during the calendar year in which such sinking fund payment is required to be made. Moneys deposited in the sinking fund shall be applied on a pro rata basis to the redemption of shares of Series 2 Stock on or before December 31 or the year in which such sinking fund payments is required to be made.

SF 14.

Each share certificate of Series 2 preferred held by the plaintiffs also states on its face:

> The certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Certificate of Incorporation . . . and all amendments thereof (copies of which are on file at the office of the Corporation and its transfer agents), to all of which the holder of this Certificate hereof assents.

SF 15.

### Genesco's Suspension of Redemption and Dividends

In the early 1970's, Genesco's financial condition began to deteriorate. In 1973 Genesco suspended dividend payments for all shares of its common stock. That suspension continues to date. SF 17.

On or about January 2, 1974, when the first mandatory redemption payments were due to the plaintiffs, Genesco deposited funds in a bank adequate to redeem 20% of the Series 2 preferred stock. The redemption took place on January 11, 1974. On January 2, 1975, Genesco again deposited the moneys necessary to redeem an additional 20% of the Series 2 preferred stock; redemption took place that same day. SF 18.

Genesco's financial situation continued to deteriorate through late 1974 and early 1975. The uncontroverted testimony of Genesco's chief financial officers was that the payment of dividends on any shares of series stock in March 1975, other than the $4.50 preferred, would have put the company in default under the Loan Agreements. T 156–57. Default on the Loan Agreements would result in cross-default on other long-term debts, T 157–58, and might well have precipitated Genesco's collapse. T 172–73, 178–79, 253.

On March 25, 1975, Genesco's Board of Directors decided to suspend all dividends payable April 30, 1975 on all outstanding series of its preferred stock.[6] Genesco has made no deposits to the Series 2 preferred stock sinking fund and has redeemed no Series 2 preferred since January 2, 1975. SF 19.

Redemption of the Series 2 Preferred stock was to take place annually in January during the years fixed for redemption.

As to January 1976, both sides agree that Genesco could have paid all preferred stock arrearages and made the redemptions of the Thomas stock scheduled for that month without violating either the 275% Net Tan-

---

**6.** Genesco continued to pay dividends to the holders of the $4.50 Preferred Shares who had the right to place two members on the Genesco Board in the event that payments were not made. The evidence at trial showed that payment of dividends on the $4.50 preferred had a relatively minor impact on Genesco's financial problems; payments on the $4.50 preferred cost Genesco $200,000 per year. Payments sufficient to clear arrearages on the remainder of the preferred stock senior to the plaintiffs' would have cost $1.6 million even by the end of 1975, SF 29.

gible Assets test or the 200% Net Current Assets tests of the Loan Agreements. Genesco argues that the clearance of the 200% test at that time resulted from a quirk, rather than an improved financial condition, in that approximately $50 million of long term debt had recently become due within one year and was therefore no longer in the denominator of the test fraction as "Consolidated Funded Indebtedness". Genesco points out that this change really represented a worse, rather than a better, financial condition since this debt required prompt refinancing, the result of which would be to put Genesco promptly below the 200%. Despite this qualitative evaluation, Genesco does not dispute that payment of the dividend arrearages and the redemptions in question would not have constituted default on the Loan Agreements in January 1976.

In March 1976, it is undisputed that such dividend payments and redemptions could not have been made without violation of the Note ratios.

As to January 1977, the time provided for the fourth redemption payment, the parties dispute whether such payments would have cleared the Note ratios. The dispute turns on whether or not a newly promulgated Accounting Principles Bulletin called for inclusion in current liabilities of the current portion of capitalized lease obligations. In either event, by April 1977 both sides agree that Genesco was in deficit with respect to the 200% test.

It is further undisputed that at no time since April 1977 has Genesco been able to make such payments without triggering default on the Note Agreements.

Since March 25, 1975 Genesco has not paid dividends on and has not redeemed any shares of any series of its preferred stock except for certain dividends on and redemptions of its most senior series, the $4.50 preferred stock which is outstanding in only a small amount. SF 23. Genesco's failure to redeem (or permit conversion of) preferred stock issued pursuant to other acquisitions has led to a series of lawsuits, see, e. g., *Camp v. Genesco, Inc.,* 75 Civ. 3471 (Sept. 11, 1978 & February 14, 1979 S.D.N.

Y.); *Denco v. Genesco, Inc.,* N.Y.L.J. (October 31, 1978, p. 7, col. 2) (Sup.Ct.N.Y.County), *modified and aff'd,* 427 N.Y.S.2d 434 (App.Div. 1st Dep't 1980).

## II

Plaintiffs advance three independent lines of argument. First, Genesco entered into a binding contractual commitment to make the redemption payments on the dates scheduled in the Plan, and this obligation was not subordinate to arrearages on more senior preferred stock issues. Second (and less extreme), by the terms of the Plan requiring the redemptions, Genesco committed itself to exercise its discretion to make all payments due to more senior issues so as not to bar the contractually required redemption payments to the Thomas issue; (or, put in other words, Genesco obligated itself not to suspend payments on senior issues). Third, the plaintiffs assert that for Genesco to rely on its charter as a justification for dishonoring its commitment to redeem would represent an unfair, unenforceable and equitably barred defense, akin to the invocation of the *ultra vires* defense which is not available to corporations under Tennessee law, see Tennessee General Corporation Act § 48–405, and is disfavored by courts in Tennessee and in this District, see *Camp v. Genesco, Inc., supra.*

For reasons stated below, I find all three arguments to be without merit, and accordingly, I find for the defendant.

■ a. The first position, indeed, is not seriously advanced by the plaintiffs. The Thomases did not receive an outright contractual commitment of redemption, nor did they receive a debt instrument calling for payment on specified dates. What they received was a subordinated issue of preferred stock. *See Alco Products, Inc. v. White Motor Corp.,* 76 Civ. 5090 (Op. at 10) (Nov. 8, 1978 S.D.N.Y.). The meaning of its various provisions can be understood only in the context of the overall corporate charter, setting forth the relationship of this subordinated issue to more senior issues. There can be no question that Genesco's charter

provisions fixing the rights of preferred issues senior to this one, *see* DX 32 Article Sixth, Part B–1(3), bar Genesco from making redemption or dividend payments on the subordinated stock while senior issues are in arrearages.

Plaintiffs point to numerous instances in the Plan, the charter, the stock itself, and in various memoranda of Genesco officials, suggesting that the obligation had a "mandatory" character. Those provisions, however, are in no way inconsistent with the conclusion here expressed. The obligation was mandatory, and enforceable in a court of law as such, but only in appropriate circumstances. If there was no legal bar to the making of the redemption payments, Genesco would have been legally obligated to make them. In this sense they were indeed mandatory. It does not follow however, that the obligation was not subject to the subordination provisions applicable to more senior issues. Unless by reason of the plaintiffs' second or third arguments, the subordination provisions in charter were invalidated or inapplicable, it is clear that Genesco was barred by these from making the redemption payments in question while senior issues were in arrears.

█ b. The second branch of plaintiffs' argument is as follows: Acknowledging that arrearages in the more senior preferred issues would bar payment of the redemptions of the plaintiffs' subordinated stock, plaintiffs argue that the contractual commitment to redeem (subject to applicable subordination provisions) involved an undertaking on Genesco's part not to exercise its discretion so as to cause any arrearages in the senior issues which would have the effect under the charter of barring the redemption payments. For purposes of this argument, plaintiffs would accept as a point of departure that under ordinary circumstances a corporation's board of directors has discretion to use its business judgment whether or not to declare dividend payments, even as to a preferred stock whose

dividend if passed would remain payable thereafter on an accrued basis. *Cf. Guttman v. Illinois Central Ry. Co.*, 189 F.2d 927 (2d Cir. 1951). Plaintiffs argue that by entering into the firm or "mandatory" redemption commitment which was a part of the Thomas Plan of Acquisition, Genesco made a contractual commitment to the effect that it would not by its own discretionary act render its performance of its obligations impossible. *See Titus v. Piggly-Wiggly Corp.*, 2 Tenn.App. 184 (1925).

In my view this argument could be made with differing results depending on the circumstances to which the argument was applied. Starting at one end of the spectrum would be an action by the corporate board of directors taken in bad faith for the express purpose of undoing the subordinated stockholders right to redemption. Supposing for example that the board of directors with the agreement of a small group of senior preferred holders would pass their dividend for the purpose of obtaining charter justification to preclude payment of the subordinate redemption provisions. Such circumstances would certainly support a most powerful argument that those actions amounted to a breach of the contract because the contract contained an implied condition of good faith. However, that circumstance is not raised here. Plaintiffs have explicitly acknowledged that they are not contending that Genesco acted in bad faith.[7]

A second circumstance arguably indistinguishable from the first would be that in which the board of directors would arbitrarily or capriciously withhold payment on senior dividends without serious justification in financial circumstances, having the effect, even if not the intention, of barring redemption of the junior preferred in accordance with its redemption schedule. I need not concern myself how plaintiffs' argument would apply to those circumstances because I find as a matter of fact that they are not applicable. The decision of the

---

**7.** Since papers filed prior to trial and in formal discussions held at that time suggested the possibility that plaintiffs might have been alleging bad faith, I expressly asked plaintiff's counsel during trial whether plaintiffs relied on such a contention and was told that plaintiffs do not.

board of directors to withhold payment of senior preferred dividends and the plaintiffs' redemption payments occurred in dire catastrophic financial circumstances. While it is true that the making of such payments in January of 1976 would not in itself have constituted an event of default, it would have pushed the company dangerously close to bankruptcy. As noted above, the only reason why such a payment in January, 1976 would not have constituted an event of default was because a large amount of long term debt had become short term and was thus eliminated from the denominator of the prescribed ratio. This meant that that debt needed to be refinanced, the corporation being without resources otherwise to pay it. The making of senior payments and redemption payments would have seriously threatened Genesco's ability to negotiate that necessary refinancing and might well have pushed the company towards bankruptcy. Accordingly, I find that these facts do not raise the situation of the whimsical, arbitrary or capricious failure to pay senior dividends.

Rather they fall at a third level, where the payment of the more senior dividends, which the board of directors decided to withhold, would not have constituted an event of default, but would have represented a serious endangerment to the continued existence of a corporation in dire condition.

The fourth level to be considered is that at which the payment of the senior preferred dividends would constitute an act of default. All parties agree that this correctly describes the circumstances obtaining in January of 1978. Plaintiffs do not contend that their argument is applicable to this circumstance. Plaintiffs acknowledge that, however mandatory were their rights to receive redemption payments and to have the senior preferred issues paid off so that they did not stand in the way of such redemption, these obligations were not so mandatory as to require the making of payments which would constitute defaults under the loan agreement unless waived.

*A fortiori*, it follows that plaintiffs' argument would not be applicable to the fifth circumstance where the corporation was under the protection of a bankruptcy or reorganization court. In other words in such circumstances, shareholders similarly situated to the plaintiffs would not be able to up their status to that of a creditor by showing the refusal on the part of the corporation to pay the mandatory redemptions or the more senior arrearages, as they no doubt would in the first instance discussed where the non-payment had been a bad faith device to defeat their right of redemption.

Having reviewed the possible spectrum of circumstances in which a corporation might invoke senior arrearages as a bar to the payment of otherwise mandatory stock redemptions, I consider the application of plaintiffs' argument to the part of the spectrum raised by the circumstances of this case. I find no authorities which are clearly controlling and the parties have pointed to none. In my judgment, in these circumstances the board of directors retained the right to exercise its business judgment not to pay senior dividends where the making of such payments might well have hurtled the corporation towards bankruptcy. Indeed the payment of preferred dividends under such circumstances would surely have exposed the directors to the risk of serious liabilities for unconscionable mismanagement. *Compare Alco Products v. White Motor Co., supra.*

Accordingly, I find that Genesco's non-payment of senior dividends in 1976 and 1977, with the consequent non-payment of the plaintiffs' redemption rights, did not constitute a breach of Genesco's commitment to the plaintiffs.

█  c. The plaintiffs contend that the subordination provisions for senior stock should be construed extremely narrowly for the purposes of interpreting the scope of the defendant's obligation to redeem the plaintiffs' preferred stock on the ground that a corporation's invocation of its charter in these circumstances to defeat its own contractual obligations is unfair and inequitable. The plaintiffs correctly note that in related circumstances, two courts have found that Genesco could not rely on char-

ter provisions to avoid its obligations to other preferred shareholders.

For the reasons stated below, I find that the decisions and reasoning in *Camp v. Genesco, supra,* and *Denco v. Genesco, supra,* are not controlling here and that giving effect to the senior subordination provisions in the Genesco charter is reasonable and fair under the circumstances. Plaintiffs here at the time they made their deal were fully chargeable with notice of the significance of those charter provisions.

In *Camp v. Genesco,* the court granted summary judgment on behalf of certain holders of Genesco's Convertible Preference Stock attempting to exercise their contractual right to convert their stock. The court rejected Genesco's contention "that irrespective of the expressed intent of the parties, [the] court must read the terms of the [*Genesco*] charter into the parties' contract as a matter of law," Opinion of September 11, 1978, at 15. The court found that Genesco had granted the *Camp* plaintiffs an "unqualified right" to convert their stock in the acquisition contract, but that Genesco sought to invoke a pre-existing charter provision in order to avoid its contractual obligation. The court characterized Genesco's position as an invocation of the disfavored "ultra vires" defense, which would not be given effect to defeat contractual obligations. Opinion of February 14, 1979, at 1–3.

In *Denco v. Genesco,* the court also barred Genesco from avoiding its contractual obligation by relying on the charter provisions in question, *see* Opinion of October 23, 1978, at 30.[8]

I do not consider *Camp* or *Denco* controlling in this case. In *Camp* and *Denco,* the

plaintiffs received stock previously authorized by the corporation. No charter amendment was required to create the instruments received by the plaintiffs. In both instances, the courts found that it was unfair and unlawful for the defendant Genesco to invoke the charter to defeat what the junior shareholders reasonably understood to be unconditional obligations created and defined exclusively by the acquisition agreements.

In this case, I find that the plaintiffs received notice in the Plan itself that their stock, and the rights represented by that stock, were creatures of the charter and as such subordinate in their rights to senior issues. The Plan designated the stock to be issued to the Thomases as "subordinate," and named explicitly the four more senior issues; the Plan indicated that the new issue of stock would be created by charter amendment; it referred to subordination provisions to be placed in the charter for the benefit of this new issue (which in fact were identical to the pre-existing provisions in the charter for the benefit of the more senior issues); the provision for subordination in the Plan made clear that senior rank carried with it the right to bar payments to junior issues during arrearages. The plan furthermore contained an explicit acknowledgment of awareness of the charter. The subordination provision actually created as a charter amendment authorizing the Thomas issue explicitly referred to more senior issues and to their protection against payments being made to more junior issues during senior arrearages.

Additionally, other evidence confirms that the Thomases were on reasonable notice of the relationship of the senior subor-

---

**8.** On appeal, the Appellate Division affirmed the judgment of the court below. Two of the five Justices on the *Denco* panel concurred specially, however, on the ground of the collateral estoppel effect of the *Camp* decision. The two concurring Justices noted that:

As an original matter, we would have grave doubts as to whether holders of subordinated classes of stock have a right to exchange their stock for a higher ranking security . . . . in

the face of a provision of the certificate of incorporation which appears to forbid [the same] in such circumstances. In general, we would suppose that the relative priorities of different classes of securities would necessarily be governed by the certificate of incorporation . . . .

*Denco v. Genesco, supra,* 427 N.Y.S.2d 434, 435.

dination provisions contained in the charter to the description of the Serial 2 Preferred in the Plan. Both the stock certificate issued to the plaintiffs, SF 15, and Susan Thomas' own proxy statement, DX 101 (at 13),[9] confirm that the plaintiffs reasonably understood that "Genesco shall not purchase or redeem any shares of any class of stock so long as it has failed to pay dividends in full on any class of stock senior thereto." *Id.*

I find that the senior subordination provisions were in all respects a part of the Thomas agreement and that no doctrine of equity properly bars giving them effect.

The fact that the Thomases were surprised in 1976 by Genesco's invocation of the subordination provisions is not because these were not sufficiently signalled at the time of their negotiations. It is rather because in the climate of excessive optimism that prevailed in 1968, the Thomases, like so many others, never seriously contemplated the possibility that Genesco seven years later might be on the brink of bankruptcy.[10]

It should be recognized furthermore that the price at which they sold their company, received in junior preferred stock, with its attendant risk, was a far higher price than that at which they could have sold in a cash or debt deal which would not have qualified for pooling. The high price was of course a function of the risks which unfortunately became the concerns of a later day.

The complaint is ordered dismissed in all respects.

So ordered.

---

9. The plaintiffs' proxy statement sent to Susan Thomas shareholders provides in pertinent part:
   > GENESCO shall not purchase or redeem any shares of any class of stock so long as it has failed to pay dividends in full on any class of stock senior thereto.

   DX 101 (at 13). The plaintiffs attempt to dismiss this as evidence of their understanding by arguing, first, that the Thomases were already committed to voting for the "pooling of interests" with Genesco at the time that the proxy statement was sent out, and, second, that the Thomases understood that the statement in the proxy regarding the impact of suspension of senior dividends on junior stock redemption was limited or modified by this sentence, which followed the provision quoted above:
   > Certain restrictions on the payment of dividends on Genesco capital stock and on the acquisition of the Company's promissory notes are provided for in the loan agreements under which the Company's promissory notes were issued.

   *Id.*

   I find that the fact that the plaintiffs were committed to voting for the acquisition by Genesco when the Susan Thomas proxy statement was issued does not mitigate the evidentiary value of the proxy statement as a manifestation of the plaintiffs' understanding of the rights they acquired in the May 1968 Plan. More-

over, I find that the plaintiffs' reading of the Susan Thomas proxy is not a reasonable one; a fair construction of the two sentences would lead a reasonable person to be on notice that the conditions imposed by the possible nonpayment of dividends on senior securities and the restrictions related to the Loan Agreements were independent.

10. George Thomas testified that upon seeing language in the Susan Thomas proxy statement referring to the Loan Agreements and to the impact of suspension of senior stock dividends on dividends and redemption of junior stock, he questioned Maxey Jarman who told him that the likelihood of suspension of Series 2 redemptions was very remote, T 120, 140–41. Thomas was evidently reassured by the presence of the $43,000,000 cushion as of April 30, 1968, which amount was free of any such restrictions.

   Virtually the entire $43,000,000 cushion had disappeared, however, as of 1976–77, regardless of whether lease obligations are considered part of Genesco's current liabilities. Thus, the loss suffered by the plaintiffs was precipitated by events which were generally within the scope of the risk that the plaintiffs were willing to tolerate in 1968. The barrier which in 1968 had made the restrictive impact of the Loan Agreements a remote concern had, in fact, disappeared.